Nicholas **ZBICIAK**, Plaintiff–Appellant,

v.

**HERALD CO., d/b/a The Flint Journal,** Defendant–Appellee.

No. 01–1655.

United States Court of Appeals, Sixth Circuit.

Oct. 11, 2002.

Before KENNEDY and MOORE, Circuit Judges; and DOWD,* District Judge.

## OPINION

MOORE, Circuit Judge.

In this appeal, Plaintiff–Appellant Nicholas Zbiciak ("Zbiciak") challenges the district court's grant of summary judgment in favor of his former long-term employer, Defendant–Appellee The Herald Company, d/b/a *The Flint Journal* (the "Journal"). The Journal removed Zbiciak from its payroll when his medical leave of absence expired and he failed to apply for a general leave of absence. Zbiciak filed suit against the Journal in a Michigan state court alleging breach of his employment contract. He contends that he was terminated in violation of the Journal's job security pledge. The Journal removed the case to federal district court and moved for summary judgment. Concluding that Zbiciak failed to produce evidence of breach of contract, the district court grant-

ed the Journal's motion. Zbiciak appeals from the district court's decision. For the reasons discussed below, we **AFFIRM** the district court's summary judgment for the Journal.

## I.

Zbiciak, most recently employed in the Marketing Department, worked at the Journal in various capacities for more than twenty-five years. During this employment period, the Journal proudly extended to its employees a "unique" job security pledge guaranteeing permanent employment to full-time, salaried employees who are not covered by a collective bargaining agreement unless the employee performs unsatisfactorily, engages in misconduct, or the newspaper ceases to publish. The job security pledge states in its entirety:

> We provide job security to all full-time, salaried employees who are not covered by a collective bargaining agreement. This means that no full-time, salaried employee will lose his or her job because of new equipment, technological advances or lack of work. Once you have satisfactorily completed a probationary period, you will become a permanent employee. Then, this unique job security pledge applies to you as long as you continue to perform your assigned tasks satisfactorily, do not engage in misconduct and this newspaper continues to publish.

Joint Appendix ("J.A.") at 9. As recently as December 31, 1998, this job security pledge was reiterated to Zbiciak in a letter from the Journal's publisher, Roger Samuel, informing Zbiciak of his most recent salary increase.

---

* Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

Alongside the promise of job security, the Journal has a comprehensive sick leave policy which enables ill or disabled employees to receive full or partial pay according to a predetermined schedule. This schedule uses an employee's years of service to calculate both the period when the employee is entitled to full salary benefits and the point at which the employee receives only a reduced salary. The sick leave policy also contains a potential safeguard for employees unable to work at the expiration of their paid sick leave which states that such an employee "may apply for an unpaid, general leave of absence in order to maintain [his or her] chance for eventual reemployment." J.A. at 9.

On May 5, 1999, Zbiciak took a paid medical leave of absence from employment at the Journal. The Journal distributed to Zbiciak the medical-leave pay that his tenure entitled him to receive. On the last day that Zbiciak was eligible to receive these benefits, March 27, 2000, the Journal sent him notification of his removal from the payroll. Zbiciak received the Journal's letter after he had already been removed from the payroll. Zbiciak neglected to request an extended general leave of absence at the expiration of his paid leave, even though he was unable to return to work. To this day, he neither has applied for an unpaid general leave of absence nor has he returned to work.

Zbiciak filed a complaint alleging breach of contract on May 24, 2000 in the Circuit Court for Genesee County, Michigan. The Journal removed the case to the Eastern District of Michigan based on diversity of citizenship and 28 U.S.C. § 1441. Near the close of discovery, the Journal moved for summary judgment. The district judge granted the Journal's motion, finding that Zbiciak failed to produce any evidence that the Journal breached the contract. Zbiciak filed a timely notice of appeal.

## II.

We review de novo a district court's order granting summary judgment. *Rannals v. Diamond Jo Casino*, 265 F.3d 442, 447 (6th Cir.2001), *cert. denied*, 534 U.S. 1132, 122 S.Ct. 1074, 151 L.Ed.2d 976 (2002). In accordance with Federal Rule of Civil Procedure 56(c), a grant of summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the initial burden of proving that no genuine issue as to any material fact exists such that it is entitled to a judgment as a matter of law. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989). To meet this burden, the moving party may rely on any of the evidentiary sources listed in Rule 56(c). *Id.* at 1478. Alternatively, the moving party may assert that the nonmoving party will be unable to produce sufficient evidence to avoid summary judgment, and, if after a reasonable opportunity for discovery the nonmoving party fails to produce any evidence which would create a genuine dispute for the jury, then summary judgment is proper. *Id.* A dispute over a material fact cannot be "genuine" unless a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing the district court's decision to grant summary judgment, we view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

According to Michigan contract law, a contract provision that is clear and unambiguous must be " 'taken and understood in [its] plain, ordinary, and popular sense.' " *Equitable Life Assurance Soc'y v. Poe,* 143 F.3d 1013, 1016 (6th Cir.1998) (quoting *Michigan Mut. Ins. Co. v. Dowell,* 204 Mich.App. 81, 514 N.W.2d 185, 188 (1994)). Such unambiguous provisions are not subject to interpretation and must be enforced as written. *See id.* Alternatively, contract provisions are considered ambiguous when the "terms are reasonably and fairly susceptible to multiple understandings and meanings." *Id.* A contract will not be considered ambiguous solely because the parties disagree as to the contract's meaning. *See id.*

Whether a contract provision is ambiguous is a question of law for the court. *Id.* In making this determination, a district court is instructed "to read the contract as a whole, and to give the contract language its ordinary and natural meaning." *City of Wyandotte v. Consol. Rail Corp.,* 262 F.3d 581, 585 (6th Cir.2001). A district court, however, should refrain from construing the terms of the contract " 'where [a contract's] meaning is obscure and its construction depends upon other and extrinsic facts in connection with what is written[. In those cases,] the question of interpretation should be submitted to the jury under proper instructions.' " *Id.* (quoting *D'Avanzo v. Wise & Marsac, P.C.,* 223 Mich.App. 314, 565 N.W.2d 915, 917 (1997)) (second alteration added). In evaluating a motion for summary judgment, the "trial court may determine the meaning of the contract only when the terms are *not* ambiguous." *D'Avanzo,* 565 N.W.2d at 917.

■■ The employee handbook provisions, which comprise the contract in the instant case, are unambiguous; thus the district court in granting the motion for summary judgment was correct to give the

contract language its "ordinary and natural meaning." *City of Wyandotte,* 262 F.3d at 585. Reading the contract as a whole, the sick pay provisions alone are controlling on the issue of whether the Journal breached its contract with Zbiciak. After setting forth the relevant time periods when an employee is entitled to receive different grades of sick benefits, the provisions continue: "[i]f you are unable to work at the end of a period of extended illness, you may *apply* for an unpaid, general leave of absence *in order to maintain your chance for eventual re-employment.*" J.A. at 9 (Compl., Ex. A) (emphasis added). The operative word in this statement is "apply," requiring some affirmative step on the part of the employee.

Notably, the sick leave provisions in the Journal's employee handbook do not set a date by which an employee must exercise his right to apply for an extended leave. Presumably an employee may let his sick benefits expire and months later apply for and receive an extended leave of absence. However, this court is not asked to determine the time restrictions, if any, for such an application. Both parties to this action concede that Zbiciak never applied for an extended leave of absence. Rather Zbiciak received notice from the Journal that he was no longer on the payroll, and the only action he pursued thereafter was to file this lawsuit.

Michigan courts have seen similar situations before. In *Stoken v. J.E.T. Elec. & Tech., Inc.,* the plaintiff failed to follow the procedures outlined in her employee handbook which required submission of medical documentation when requesting a leave of absence and notification to the personnel department to obtain an extension of leave if needed. *See Stoken,* 174 Mich.App. 457, 436 N.W.2d 389, 390–91 (1988). At trial, the court denied the defendant's motion for a directed verdict at

the close of evidence, and the jury returned a verdict for the plaintiff. The trial judge also denied the defendant's motion for judgment notwithstanding the verdict. The Michigan Court of Appeals reversed, holding that the motion for a directed verdict should have been granted on the ground that the employer did not breach its employment contract with the employee because she was discharged pursuant to the clear and unambiguous leave of absence policies contained in her employee handbook. Although the plaintiff, on two prior occasions, followed the leave of absence requirements to obtain temporary disability benefits, she failed to follow proper procedures for obtaining leave when she landed in the intensive care unit after a failed suicide attempt. According to the court, the employer was under no obligation to initiate a leave of absence on behalf of the employee. *See id.* at 393. Moreover, the employer followed its established policies and procedures when it terminated the employee for failing to obtain proper authorization for leave. *Id.*

Similarly, the Journal cannot be said to have breached its employment contract with Zbiciak when it removed him from the payroll after he neglected to follow the established procedure for obtaining extended leave as described in the employee handbook. The district court, agreeing with the defendant, determined: "you have to read this with reason, and if it says and [sic] to maintain your chance for eventual re-employment, it must mean at the end of that sick pay period[,] [i]f you do nothing, you become unemployed." J.A. at 239. Zbiciak cannot now cast blame on the Journal when he has never even attempted to preserve his employment status. Thus, even though the Journal arguably devalued Zbiciak's twenty-five years of service when it failed to give him fair warning of the pending expiration of his benefits, the

Journal's removal of Zbiciak from the payroll is insufficient to establish a breach of contract where the contract's unambiguous terms implicitly provide for employment to end upon failure to apply for a general leave of absence. *See Stoken,* 436 N.W.2d at 393.

Zbiciak argues that the provision's language permits but does not require an application for general leave. He relies on the provision's choice of language, most notably its use of the permissive word "may" as opposed to the mandatory "must." The express terms of the sick pay benefits, however, indicate that benefits are available for a set number of weeks based on years of service, not an indefinite term. Furthermore, a court should not "disregard all the other language of the contract or any of it proper to a correct interpretation or construction of the contract." *Cady v. Taggart,* 223 Mich. 191, 193 N.W. 848, 849 (1923) (noting that the court cannot accept the plaintiff's technical meaning of a disputed contract term when other language in the contract would materially conflict with such an interpretation). Likewise, construing the application for general leave as a dispensable option for the employee who desires to remain employed yet is unable presently to work, would conflict directly with the remaining language in the clause that indicates that the application is the only way to maintain a chance for re-employment when sick-leave benefits expire.

Zbiciak does not contest that he has received all the sick pay that he was entitled to receive. Nor does he contest that he failed to apply for a general leave of absence. Rather Zbiciak alleges that he was terminated in violation of the job security pledge. Presumably, Zbiciak expected to remain on the payroll after the expiration of his sick leave because he was not required to apply for extended leave and

the job security pledge provides for "permanent employment." This expectation, however, is contrary to the unambiguous terms of the contract as a whole – the sick pay provisions require an employee who has used up his paid leave to apply for a general leave of absence in order to keep his employment options alive. Nothing in this language can be construed as creating an absolute promise of employment or re-employment at the expiration of leave benefits. Rather, the commonsense interpretation of the sick pay provisions construes this language as creating a responsibility on the part of the employee to apply for general leave if such employee desires the "chance" to maintain employment.

Michigan case law requires that unambiguous contract provisions be interpreted in their "plain, ordinary, and popular sense." *Equitable Life Assurance Soc'y,* 143 F.3d at 1016. When we evaluate the contract as a whole, we are convinced that the Journal satisfied all of its obligations under the contract when it provided Zbiciak with a full array of sick leave benefits. If Zbiciak had applied for a general leave of absence, we would be presented with an entirely different question. However, because Zbiciak took no affirmative step, the language of the contract is plain, and because he has produced no other evidence that the Journal breached the contract, summary judgment was proper.

### III.

Because Zbiciak received all the sick pay that he was entitled to receive, never applied for an extended general leave of absence as required in the employee handbook, and never returned to work, we agree with the district court that the Journal did not breach its employment contract with Zbiciak. Summary judgment for the Journal was proper. Accordingly, we **AFFIRM** the district court's decision.